IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-673C |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| MAINE YANKEE ATOMIC POWER COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-674C |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| YANKEE ATOMIC ELECTRIC COMPANY, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-675C |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**PLAINTIFFS' PRETRIAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. iii

I.     INTRODUCTION ................................................................... 1

II.    PLAINTIFFS' CLAIMS .......................................................... 2

III.   UNCONTESTED ISSUES ....................................................... 2

       A.     Breach. ..................................................................... 2

       B.     Non-Breach World Out-of-Business Dates. ............................ 3

       C.     Termination of the Yankees' Health and Welfare Benefits Plans in the
              Non-Breach World. ...................................................... 3

IV.    CONTESTED ISSUES OF FACT AND LAW ................................... 5

       A.     Costs Incurred to Maintain and Administer the Yankees' Health and
              Welfare Benefits Plans (all Yankees):  $909,913. ..................... 6

       B.     Costs for General Counsel Services (all Yankees): $92,555. ........... 6

       C.     Property Disposition Costs (Yankee Atomic only): $13,778. ........... 6

       D.     Costs Associated with Wrongful Termination Lawsuit (Maine Yankee
              only):  $40,980. ......................................................... 6

       E.     Asbestos Litigation Costs (all Yankees):  $23,620. .................... 6

       F.     Costs for Wayne Plumb Memorial (Yankee Atomic only):  $6,912. ..... 7

V.     EVIDENCE CONCERNING THE HEALTH AND WELFARE BENEFITS PLANS ......... 7

       A.     The Yankees' Health and Welfare Benefits Plans and Funding of Post-
              Retirement Benefits. ..................................................... 7

       B.     The Yankees' Health and Welfare Benefits Vendors. .................. 8

       C.     The Yankees' Claims for Health and Welfare Benefits-Related Costs. ..... 10

VI.    APPLICABLE LEGAL PRINCIPLES ........................................... 11

VII.   DISCUSSION .................................................................... 14

Issue 1: The Costs the Yankees Incurred to Continue to Maintain Health and Welfare Plans with Post-Retirement Benefits Are Recoverable .......................... 14

      A.    The Yankees' Continued Provision of Health and Welfare Plans with Post-Retirement Benefits Was Reasonable ....................................... 15

          1.    Post-Retirement Benefits Are An Important Employee Retention Tool that Is Common in the Utility Industry. ............... 15

          2.    The Yankees' Continued Provision of Post-Retirement Medical Benefits Reduced Insurance Premiums for Active Employees and Allowed the Companies to Maintain Their Preferred Coverage with the Most Cost-Effective Carrier. .......... 16

      B.    The Costs the Yankees Incurred to Administer Their Health and Welfare Benefits Plans Were Reasonable ................................................. 17

      C.    The Challenged Benefits Administration Costs Were Caused by the Government's Breach. ....................................................................... 19

Issue 2: The Yankees' General Counsel's Compensation Is Recoverable. ..................... 20

Issue 3: Yankee Atomic's Costs to Research a Potential Sale of a Portion of the Yankee Atomic Site Are Recoverable. ................................................................ 21

Issue 4: Maine Yankee's Decision to Defend and Settle the Wrongful Termination Claim Brought by Its Former Security Officer Was Reasonable, and the Attendant Costs Are Recoverable. ....................................... 22

Issue 5: The Yankees' Costs to Defend Asbestos Litigation Are Recoverable. .............. 22

Issue 6: Yankee Atomic's Costs for the Wayne Plumb Memorial Are Recoverable ........................................................................................................ 23

VIII. CONCLUSION ................................................................................................................ 23

CERTIFICATE OF FILING ....................................................................................................... 25

## TABLE OF AUTHORITIES

Page

**CASES**

*Cal. Fed. Bank v. United States,*
    395 F.3d 1263 (Fed. Cir. 2005) ........................................................................ 13

*Citizens Fed. Bank v. United States,*
    474 F.3d 1314 (Fed. Cir. 2007) ........................................................................ 12

*Dairyland Power Co-op. v. United States,*
    104 Fed. Cl. 400 (2012) .................................................................................... 12

*Dairyland Power Co-op. v. United States,*
    128 Fed. Cl. 499 (2016) .................................................................................... 14

*Duke Energy Progress, Inc. v. United States,*
    135 Fed. Cl. 279 (2017) .................................................................................... 13

*Entergy Nuclear Indian Point 2 v. United States,*
    128 Fed. Cl. 526 (2016) ........................................................................ 11, 12, 14

*First Heights Bank, FSB v. United States,*
    422 F.3d 1311 (Fed. Cir. 2005) ........................................................................ 13

*Franconia Assocs. v. United States,*
    61 Fed. Cl. 718 (2004) ................................................................................ 13, 14

*Home Sav. of Am. v. United States,*
    399 F.3d 1341 (Fed. Cir.2005) ......................................................................... 13

*In re Kellett Aircraft Corp.,*
    186 F.2d 197 (3d Cir. 1950) ............................................................................. 14

*Ind. Mich. Power Co. v. United States,*
    422 F.3d 1369 (Fed. Cir. 2005) ................................................................. 11, 13

*Ketchikan Pulp Co. v. United States,*
    20 Cl. Ct. 164 (1990) ....................................................................................... 13

*Koby v. United States,*
    53 Fed. Cl. 493 (2002) ...................................................................................... 14

*Maine Yankee Atomic Power Co. v. United States,*
    225 F.3d 1336 (Fed. Cir. 2000) .......................................................................... 3

*Sacramento Mun. Util. Dist. v. United States*,
    293 Fed. Appx. 766 (Fed Cir. 2008) ................................................................ 14

*Sacramento Mun. Util. Dist. v. United States*,
    70 Fed. Cl. 332 (2006) ..................................................................................... 14

*Tenn. Valley Auth. v. United States*,
    69 Fed. Cl. 515 (2006) ..................................................................................... 13

*TPL, Inc. v. United States*,
    118 Fed. Cl. 434 (2014) ................................................................................... 13

*Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee*,
    683 F.3d 1330 (Fed. Cir. 2012) ....................................................................... 12

*Yankee Atomic Elec. Co. v. United States*,
    113 Fed. Cl. 323 (2013) ................................................................................... 14

*Yankee Atomic Elec. Co. v. United States*,
    125 Fed. Cl. 641 (2016) .................................................................... 3, 5, 12, 21

*Yankee Atomic Elec. Co. v. United States*,
    42 Fed. Cl. 223 (1998) ....................................................................................... 2

*Yankee Atomic Elec. Co. v. United States*,
    536 F.3d 1268 (Fed. Cir. 2008) ....................................................................... 13

## OTHER AUTHORITIES

13 Me. Stat. § 1408 .............................................................................................. 23

Conn. Gen. Stat. Ann § 33-887 ............................................................................ 23

Mass. Gen. Laws ch. 156D, § 14.07 .................................................................... 23

Restatement (Second) of Contracts
    § 347 cmt. c (1981) .......................................................................................... 11

Pursuant to the Court's August 24, 2018 Order, plaintiffs Connecticut Yankee Atomic Power Company ("Connecticut Yankee"), Maine Yankee Atomic Power Company ("Maine Yankee"), and Yankee Atomic Electric Company ("Yankee Atomic") (collectively, "the Yankees") submit the following Pretrial Memorandum of Contentions of Fact and Law.

## I.  INTRODUCTION

Nearly 99% of the Yankees' present claims are undisputed because in the three previous rounds of this litigation, this Court has resolved almost all of the significant issues of fact, leaving only one for trial here.

The Federal Circuit has ruled that in mitigating damages, the non-breaching party must make only those efforts that are fair and reasonable under the circumstances.  The Yankees pay certain administrative expenses to maintain the health and welfare benefits plans that they have historically offered to their employees.  The question is whether it is fair and reasonable for the Yankees to continue those plans.  Once that is decided, future phases of this litigation should be a mere accounting exercise, at least until the Government performs.

This fourth round of lawsuits concerns the period from January 1, 2013 through December 31, 2016, typically called "Phase IV."  This Court has already determined that had the Government performed under the Standard Contract, each Yankee would have been out of business before Phase IV.  As a result of the Government's breach, the Yankees were forced to stay in business for the sole purpose of managing and safely storing the spent nuclear fuel and high-level nuclear waste (collectively, "SNF") remaining at their sites.  To attract and retain a capable workforce to continue these operations, the Yankees offer their employees competitive health and welfare benefits, including post-retirement medical, dental and life insurance benefits.  Offering such benefits serves legitimate business needs and is consistent with the benefits

offered by other utility companies.   The Government contends that it was unreasonable for the Yankees to continue to provide post-retirement health and welfare benefits, and that the costs the Yankees incurred to administer that portion of their benefits plans should be disallowed.   Such challenged costs total $909,913, or approximately 85% of the total amount in dispute in these Phase IV suits.   For the reasons described below, all of the Yankees' claimed costs to administer their health and welfare benefits plans are recoverable.

In addition, for reasons also described below, the five other categories of costs in dispute, totaling $177,845 in the aggregate, are also recoverable.

## II.   PLAINTIFFS' CLAIMS

In Phase IV, the Yankees claim $104,360,215 in damages, broken down by company as follows:

| | |
|---|---|
| Connecticut Yankee: | $   41,082,636 |
| Maine Yankee: | $   34,780,920 |
| Yankee Atomic: | $   28,496,659 |
| Total: | **$  104,360,215** |

On July 24, 2018, the Yankees moved for partial summary judgment and entry of judgment concerning $103,148,378 in undisputed damages.   (DE # 28).   The Government conceded in its response brief that such costs "represent[] costs incurred to reasonably operate and maintain [the Yankees'] SNF storage facilities . . . . due to DOE's delay."  (DE # 30, at 1).

## III.   UNCONTESTED ISSUES

### A.   Breach.

In Phase I, this Court granted the Yankees' motion for summary judgment as to liability. *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223 (1998).  In an interlocutory appeal, the

Federal Circuit affirmed, holding that the Government was liable to each of the Yankees for breach of a "critical and central obligation" of its contract with each Yankee – "that it begin disposal of nuclear waste by January 1, 1998." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000).

### B. Non-Breach World Out-of-Business Dates.

The nuclear power plant formerly existing at each Yankee site has been permanently shut down and decommissioned.[1] "[E]ach [Yankee] [thus] maintains its corporate existence only due to the SNF stored at the site[] as a result of the Government's breach of its obligations to dispose of it." *Yankee Atomic Elec. Co. v. United States*, 125 Fed. Cl. 641, 644 (2016). In Phase III, the Court determined that had the Government performed under the Standard Contract, Maine Yankee would have been out of business by the end of 2008, while Connecticut Yankee and Yankee Atomic each would have been out of business by the end of 2010. *Id.* at 647. Accordingly, if the Government had performed, the Yankees would not have incurred any costs in Phase IV.

### C. Termination of the Yankees' Health and Welfare Benefits Plans in the Non-Breach World.

The instant cases are not the first time benefits administration costs have been at issue in the Yankee litigation. In Phase III, the Yankees sought to recover costs associated with the administration of their health and welfare benefits plans that were incurred after the dates on which each plan would have been terminated in the non-breach world as part of the companies'

---

[1] Yankee Atomic stopped producing power in 1992 and completed decommissioning of its power plant in 2007. Maine Yankee and Yankee Atomic each stopped producing power in 1996 and completed decommissioning of their power plants in 2004 and 2007, respectively.

efforts to wind down and go out of business. *See Yankee Atomic Elec. Co.*, 125 Fed. Cl. at 654.[2]
In that proceeding, the Yankees argued that under the relevant plan documents, the Yankees had
complete discretion concerning termination of their plans and disposition of the funds maintained
in their "VEBA trusts."[3] In light of this discretion, the Yankees asserted that, in the non-breach
world, they likely would have chosen one of two options upon terminating their plans: (1) a
lump-sum payout of VEBA trust assets to eligible retirees, or (2) a transfer of the assets to a third
party for administration of future benefits. The Yankees argued that they would take the most
cost effective and simple approach, but did not need to choose between the two options because
either one of the alternatives would not alter either the timing of the Yankees' wind down efforts
or the associated costs of plan termination.

      In Phase III, the Government did not contest the Yankees' ability to terminate their health
and welfare benefits plans,[4] but challenged the recovery of benefits administration costs incurred
during the Phase III period on the grounds that the Yankees might have incurred such costs even
if the Government had performed. More specifically, the Government criticized the Yankees'
failure to choose which plan disposition alternative they would have implemented in the non-
breach world, and argued that, if the Yankees had chosen to transfer their plans' assets to a third
party for the administration of future benefits, the Yankees might have been required to make
payments from corporate assets to cover future benefits administration costs. According to the

---

[2] Maine Yankee assumed it would have terminated its health and welfare benefits plan in 2006, and
Connecticut Yankee and Yankee Atomic each assumed they would have terminated their plans in 2008.

[3] As further explained below, each Yankee maintains a separate trust to fund its post-retirement health
and welfare benefits, referred to as a VEBA trust.

[4] Neither did the Government challenge the reasonableness of the benefits administration costs claimed in
Phase III. The costs at issue in Phase III were for the same vendors, and for larger amounts, than the
benefits administration costs the Government challenges on reasonableness grounds in this Phase IV
proceeding.

Government, the Yankees therefore could not recover the benefits administration costs they sought to recover because they may not have been unique to the breach world.

Ultimately, the Court found that the Yankees did not offer sufficient evidence to justify awarding them the benefits administration costs they sought in Phase III. *Yankee Atomic Elec. Co.*, 125 Fed. Cl. at 654-55. In reaching its decision, the Court noted that neither party presented a witness with "expertise in the area of terminating or transferring health and welfare benefits plans." *Id.* at 654.

In this Phase IV proceeding, the Yankees will offer the expert testimony of Trevis Parson, an actuarial consultant with substantial experience in the field of health and welfare benefits, to opine on the Yankees' plan termination options in the non-breach world. Mr. Parson will offer an opinion that, in the non-breach world, at the time the Yankees would have terminated their plans, wound down, and gone out of business, the Yankees would have had only one viable option to dispose of their VEBA trust assets: to cash out, that is, disburse all assets to eligible plan participants as cash. Cashing out plan participants would have been cost-effective, simple and quick, and would have allowed the utilities to go out of business on the assumed schedules. Mr. Parson estimates that, during the relevant timeframe, costs associated with terminating the Yankees' health and welfare plans and cashing out eligible plan participants would have been approximately $50,500 for each Yankee company.

The Government has not challenged the Yankees' assertions about how they would have terminated their health and welfare benefits plans if the Government had performed under the contract.

## IV.    CONTESTED ISSUES OF FACT AND LAW

Only the following contested issues, and their associated damages, remain for trial:

**A. Costs Incurred to Maintain and Administer the Yankees' Health and Welfare Benefits Plans (all Yankees):  $909,913**.

The Yankees maintain health and welfare benefits plans.  The plans are administered using vendors providing legal, human resources, audit, actuarial and accounting services. Payments to those vendors are included in the Yankees' claims.  The Government contends that the Yankees should not have continued to offer post-retirement health and welfare benefits to certain eligible active employees and retirees during Phase IV.  It argues that the claimed damages relating to that specific feature of the plans should be disallowed.

**B. Costs for General Counsel Services (all Yankees): $92,555.**

The three Yankee utilities retain a single general counsel, Joseph Fay, Esq.  Mr. Fay is paid a fixed annual retainer to provide up to 700 hours of legal services.  The Government argues that the Yankees' claims should be reduced by that percentage of time Mr. Fay spent on legal services relating to the Yankees' SNF litigation matters, even though he would have been paid the same amount had there been no SNF litigation.

**C. Property Disposition Costs (Yankee Atomic only): $13,778.**

The Government contests the costs that Yankee Atomic incurred to evaluate the potential sale of a portion of the Yankee Atomic site for a wind energy project.

**D. Costs Associated with Wrongful Termination Lawsuit (Maine Yankee only): $40,980.**

The Government contests the costs that Maine Yankee incurred to defend and settle a wrongful termination claim asserted by a former Maine Yankee security force member.

**E. Asbestos Litigation Costs (all Yankees):  $23,620.**

The Government contests the costs that the Yankees incurred in relation to two asbestos litigation matters.

**F.   Costs for Wayne Plumb Memorial (Yankee Atomic only):  $6,912.**

The Government contests the costs that Yankee Atomic incurred for a stone monument to commemorate a long-time security manager who died from cancer.

## V.   EVIDENCE CONCERNING THE HEALTH AND WELFARE BENEFITS PLANS

This brief summary describes the evidence concerning the Yankees' health and welfare benefits plans and the related benefits administration costs.[5]

### A.   The Yankees' Health and Welfare Benefits Plans and Funding of Post-Retirement Benefits.

At all relevant times, the Yankees have provided health and welfare benefits to active employees as well as to eligible former employees (*i.e.*, retirees).  Since at least the late 1980s, Maine Yankee and Yankee Atomic have sponsored health and welfare plans that identify available benefits and determine who is eligible and how benefits are paid.  Connecticut Yankee has also sponsored its own health and welfare plan since 2001.[6]  As part of their plans, each Yankee utility has always offered post-retirement benefits to certain eligible active employees and retirees.  These post-retirement benefits include medical, dental, and life insurance.  For eligible current retirees, the plans provide insurance coverage that varies by company and retiree based on such criteria as age, years of service, and date of retirement.  With respect to active employees, the plans set forth a promise to provide insurance coverage in the future, after the employee retires, if the employee meets certain eligibility criteria.

Each Yankee utility is subject to a power contract on file with the Federal Energy Regulatory Commission ("FERC").  The power contracts allow the Yankees to include certain

---

[5] Facts concerning the other contested costs are presented within the "Discussion" section of this memorandum.

[6] Prior to 2001, Connecticut Yankee employees were eligible for benefits, including post-retirement health and welfare benefits, through arrangements with their then majority owner, Northeast Utilities Service Company.

expenses in their revenue requirements, including funding for post-retirement benefits, and to collect rates sufficient to satisfy those costs from their wholesale customers (*i.e.*, their owners[7]). Each Yankee has therefore sought and received approval from FERC to prefund its plan's post-retirement benefit obligations through wholesale rate recovery from its owners.  The owner companies, in turn, generally seek to recover these costs through the rates they charge to retail ratepayers in the form of monthly electric bills.

The collected funds are maintained by each Yankee in an external trust which qualifies as a voluntary employees' beneficiary association (VEBA trust) under the Internal Revenue Code. The funding level of each Yankee's VEBA trust as compared to actuarial projections of the future cost of post-retirement benefits varies by company and year.  The Yankees have historically paid insurance premiums for retirees from VEBA trust assets, insurance premiums for active employees from corporate assets, and benefits administration costs from both VEBA trust and corporate assets, based on the companies' discretion.

### B.     The Yankees' Health and Welfare Benefits Vendors.

During Phase IV, the Yankees offered medical insurance to active employees and eligible retirees through Cigna Healthcare ("Cigna").  The Yankee utilities are three separate companies with three separate health and welfare plans,[8] but they combined all of their active employees and eligible retirees into one group insurance plan to achieve fully-insured medical coverage at

---

[7] Each Yankee is jointly owned by a collection of other utilities operating in the northeast United States. Each Yankee's ownership is different, although some owner companies hold an ownership interest in more than one Yankee.

[8] Although the Yankees share certain employees and resources to mitigate costs, each Yankee is an independent corporate entity, with its own board of directors, and with no legal relationship to the other two Yankee companies.  Each company therefore has its own interests with respect to its health and welfare plan, and the funds that have been accumulated for that plan.

the most competitive rates.  The Yankees also offered dental and life insurance to active

employees and retirees, and long-term disability insurance to active employees only.

To maintain and administer their benefits plans during Phase IV, the Yankees retained

legal, human resource ("HR"), audit, actuarial and accounting services, as follows:

- **Legal:  Verrill Dana LLP.**  Verrill Dana, a Portland, Maine-based law firm, has

  served as Maine Yankee's benefits counsel since 1993.  Connecticut Yankee and

  Yankee Atomic moved their benefits legal work to Verrill Dana in 2006 to gain the

  efficiencies of having one firm oversee all three companies' benefits-related legal

  work and to avoid the higher hourly rates and legal fees the companies were paying to

  Boston and Connecticut firms. With respect to the Yankees' health and welfare

  benefits, Verrill Dana's services include: drafting the companies' health and welfare

  plans; updating and amending the plans to comply with changes in the law, such as

  the Affordable Care Act; and preparing annual regulatory filings relating to the

  welfare plans.

- **HR:  CBAS (Karen Cox).**  Karen Cox is a former Yankee Atomic employee who

  continues to work as the benefits manager for all three Yankee companies on a part-

  time, contracted basis.  The Yankees have no internal human resources employees,

  and Ms. Cox manages all aspects of the companies' benefits programs.  She is the

  primary point of contact for the Yankees' employees and retirees receiving benefits,

  and serves as the liaison between plan participants and the Yankees' insurance

  carriers.  In addition, she is responsible for administering the annual open enrollment

  process for plan participants, overseeing insurance carrier billing and payment issues,

and maintaining the Yankees' benefits records database.  Ms. Cox was paid
approximately $90,000 ($30,000 per company) per year during Phase IV.

- **Audit:  Berry Dunn LLP.**  Berry Dunn is a Portland, Maine-based accounting and
  audit firm that conducts the annual audit of each Yankee's health and welfare plan.
  During Phase IV, Berry Dunn provided these services to the Yankees pursuant to an
  annual fixed-fee arrangement that ranged from $10,250 to $11,200 per company.
  The Yankees moved their audit work to Berry Dunn from a large national firm to
  reduce costs.

- **Actuarial:  The Savitz Organization.**  Savitz's services include developing
  estimates of the expected costs of each Yankee's future post-retirement benefit
  obligations and comparing those estimates with the current funding available in the
  Yankees' VEBA trusts.  Savitz's actuarial valuations are required for various of the
  Yankees' financial and regulatory disclosures and filings.  During Phase IV, each
  Yankee paid for Savitz's services pursuant to a fixed-fee arrangement that ranged
  between $16,200 and $24,780 per year.  The Yankees moved their actuarial work to
  Savitz in 2010, resulting in an approximately 75% reduction in annual costs from
  their prior vendor.

- **Accounting:  Marcum LLP.**  Marcum provided tax accounting services to the
  Yankees in Phase IV, including periodic services relating to the companies' health
  and welfare benefits plans.

  **C.   The Yankees' Claims for Health and Welfare Benefits-Related Costs.**

The total costs of the Yankees' health and welfare benefits programs, inclusive of
insurance premiums and administrative costs, exceeded $13.5 million in Phase IV.  The Yankees

did not include all of these costs in their damages claims.  Specifically, in preparing their Phase IV claims, the Yankees excluded those insurance premiums for retirees and administrative costs that were paid from VEBA trust assets.  The Yankees' Phase IV claims for health and welfare benefits-related costs include those insurance premiums for active employees and administrative costs that were paid from corporate assets.  The total amount of these claimed costs is approximately $2.9 million.

The Government does not contest the recoverability of the premiums that the Yankees paid for medical, dental, long-term disability or life insurance for active employees.  Nor does it dispute all benefits administration costs.  The Government's challenge is limited to the administrative costs that it claims that the Yankees incur because they continue to provide post-retirement health and welfare benefits to eligible active employees and retirees.  Specifically, the Government disputes the recoverability of the following costs paid to the vendors identified above:

|  | **CY** | **MY** | **YA** | **Total** |
|---|---|---|---|---|
| Verrill Dana | $     77,538 | $       8,125 | $  100,749 | $    186,412 |
| CBAS (Karen Cox) | $   117,189 | $   116,710 | $  117,397 | $    351,297 |
| Savitz | $     69,785 | $   102,605 | $    69,422 | $    241,812 |
| Berry Dunn | $     42,565 | $     42,565 | $    42,565 | $    127,695 |
| Marcum | $             - | $       1,190 | $      1,509 | $        2,699 |
|  | $   307,078 | $   271,194 | $  331,641 | $    909,913 |

## VI.   APPLICABLE LEGAL PRINCIPLES

"The remedy for a partial breach of contract is 'damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed.'" *Entergy Nuclear Indian Point 2 v. United States*, 128 Fed. Cl. 526, 534 (2016) (quoting *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)).  "[T]he general

principle is that all losses, however described, are recoverable." *Ind. Mich. Power Co.*, 422 F.3d at 1373 (quoting Restatement (Second) of Contracts § 347 cmt. c (1981)).

Faced with the Government's continuing breach of the Standard Contract, and having been provided no date in the future for when the Government will perform, the Yankees are obligated to use reasonable efforts to mitigate damages. *See Dairyland Power Co-op. v. United States*, 104 Fed. Cl. 400, 402-03 (2012). In partial breach cases, such as these, the Yankees are also entitled to mitigation damages, which "are intended to reimburse a non-breaching party to a contract for the expenses it incurred in attempting to rectify the injury the breach caused it." *Id.* (quoting *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1320 (Fed. Cir. 2007)). To recover such costs, the Yankees "must show by a preponderance of the evidence that: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor for the damages; and (3) the damages are shown with reasonable certainty." *Entergy Nuclear Indian Point 2*, 128 Fed. Cl. at 534.

To establish that damages were reasonably foreseeable, "a plaintiff must show that the type of damages are foreseeable as well as the fact of damage." *Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee*, 683 F.3d 1330, 1344 (Fed. Cir. 2012). As the Federal Circuit has explained:

> Although this does not require "actual foresight" that the breach will cause a "specific injury or a particular amount in money[,] ... the injury actually suffered [still] must be *one of a kind that the defendant had reason to foresee* and of an amount that is not beyond the bounds of reasonable prediction."

*Id.* (alterations in original) (citation omitted). In these cases, it has been established in the prior rounds of litigation that the Yankees' costs to operate and maintain their SNF storage facilities and continue their corporate existence were reasonably foreseeable in the event of the Government's breach. *See, e.g.*, *Yankee Atomic Elec. Co.*, 125 Fed. Cl. at 653-54.

To determine causation, this Court has discretion to use "the substantial factor test" or "the more traditional 'but-for' test." *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 172-73 (Fed. Cir. 2008). Under either standard, it is well settled that a plaintiff need not prove that the Government's breach was the "sole" cause of the claimed damage. *See, e.g.*, *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 750 (2004) ("[P]laintiffs need not show that each dollar claimed was entirely unaffected by outside events."). As the Federal Circuit has observed: "The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005).

Finally, damages must be "shown with reasonable certainty." *Indiana Michigan*, 422 F.3d at 1373. "[T]he amount of damages need not be ascertainable with absolute exactness or mathematical precision." *Id.* (quotation marks and citation omitted). No particular type of documentation, such as an actual invoice, is required.

In mitigating damages, "the non-breaching party [must] make only 'those efforts that are fair and reasonable under the circumstances.'" *First Heights Bank, FSB v. United States,* 422 F.3d 1311, 1316 (Fed. Cir. 2005) (quoting *Home Sav. of Am. v. United States*, 399 F.3d 1341, 1353 (Fed. Cir.2005)). It "is not required to make extraordinary efforts to ferret out the single best situation which will absolutely minimize the breaching party's damages. All that is required is that the [non-breaching party] act reasonably and promptly given the circumstances." *TPL, Inc. v. United States*, 118 Fed. Cl. 434, 445 (2014) (quoting *Ketchikan Pulp Co. v. United States,* 20 Cl. Ct. 164, 166 (1990)). "[I]f the Government seeks reductions in claimed damages, it 'bears the burden of showing that [plaintiff's] mitigation efforts were unreasonable.'" *Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279, 287 (2017) (quoting *Tenn. Valley Auth. v.*

*United States*, 69 Fed. Cl. 515, 523 (2006)); *see also Sacramento Mun. Util. Dist. v. United States*, 293 Fed. Appx. 766, 772 (Fed Cir. 2008); *Entergy Nuclear Indian Point 2*, 128 Fed. Cl. at 534; *Dairyland Power Co-op. v. United States*, 128 Fed. Cl. 499, 504 (2016).

"[T]he established standard for evaluating the reasonableness of mitigation efforts is 'from the perspective of one viewing the situation at the time the problem was presented.'" *Franconia Assocs.*, 61 Fed. Cl. at 744 (quoting *Koby v. United States*, 53 Fed. Cl. 493, 498 (2002)). "Reasonableness is not judged on the basis of whether the mitigation efforts were successful or necessary in hindsight." *Yankee Atomic Elec. Co. v. United States*, 113 Fed. Cl. 323 (2013). "Where a choice is required between two reasonable courses of action, the party that caused the injury may not complain that one course, rather than the other, was chosen." *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 367 (2006); *see In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950) ("The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. One is not obligated to exalt the interests of the defaulter to his own probable detriment.").

## VII.   DISCUSSION

### Issue 1: The Costs the Yankees Incurred to Continue to Maintain Health and Welfare Plans with Post-Retirement Benefits Are Recoverable.

The Yankees anticipate the Government will challenge recovery of certain benefits administration costs. Based on the pre-trial testimony of the Government's proffered benefits expert, Mark Johnson, and damages expert, Jonathan Couchman, the Yankees expect the Government to contend that the Yankees' continued provision of post-retirement benefits to

eligible active employees and retirees was unreasonable.[9]  In addition, the Yankees expect the

Government to argue that certain claimed administrative costs Mr. Couchman identifies as

relating to post-retirement health and welfare benefits (set forth in the chart on page 11, *infra*)

were unreasonably incurred, and/or that such costs were not caused by the Government's breach.

At trial, the evidence will show that the Government's experts' opinions are flawed

because these experts either misunderstand or ignore the Yankees' business operations and the

labor market within which the companies operate.  The Government's experts misinterpret even

their own data sources, which actually demonstrate the reasonableness of the Yankees' continued

provision of post-retirement benefits to their employees.  All of the benefits administration costs

the Yankees included in their claims were reasonably incurred and recoverable.

A.    **The Yankees' Continued Provision of Health and Welfare Plans with Post-Retirement Benefits Was Reasonable.**

1.    **Post-Retirement Benefits Are An Important Employee Retention Tool that Is Common in the Utility Industry.**

The Government's continuing breach of the Standard Contract has forced the Yankees to

remain in business indefinitely to maintain and protect the SNF in their possession.  One

important aspect of the Yankees' ongoing business operations is labor.  To attract and retain a

capable workforce, the Yankees maintain and administer health and welfare benefits plans that

are competitive with the benefits programs offered by other utilities.

Utilities typically offer post-retirement medical and other benefits to at least some portion

of their active and/or retiree populations.  The Yankees will show, through the testimony of their

---

[9] The Government's experts do not contest other aspects of the Yankees' benefits plans.  Mr. Johnson states in his report that "[i]t is reasonable to maintain an active employee plan as a retention tool."  Mr. Couchman concurs, and acknowledges that "the provision of current health insurance benefits to active employees is not unusual and the related insurance premium costs can be fairly attributable to DOE's delay."

fact witnesses, such as Chief Financial Officer ("CFO") Carla Pizzella, and their expert witness,

Mr. Parson, that post-retirement benefits are a key employee retention tool for the Yankees

specifically, and the utility/energy industry generally.  Mr. Parson will testify that all of the ten

utilities the Yankees identified as potential competitors for labor provide some form of

subsidized post-retirement health and welfare benefits according to their annual reports and other

public filings.  Moreover, FERC continues to find the Yankees' provision of post-retirement

benefits prudent.  As recently as 2016, FERC approved the Yankees' requests to make

contributions to their VEBA trusts to fund future post-retirement benefits obligations.

The Yankees expect that the Government, through its expert Mr. Johnson, will argue that

the Yankees' continued administration of post-retirement health and welfare benefits was

unreasonable because it was out of step with national trends to discontinue or reduce such

benefits.  The evidence will show, however, that Mr. Johnson's opinions are flawed because, in

several respects, the data upon which he relies are not relevant to the Yankees.  For example, Mr.

Johnson's analysis is not based on utility-specific information, but rather information relating to

small employers across all industries.  Mr. Parson will testify that such data is not a proper

benchmark for the Yankees' health and welfare plans, and that Mr. Johnson's own sources

include more relevant data that confirm the reasonableness of the Yankees' benefits programs.

> **2.    The Yankees' Continued Provision of Post-Retirement Medical Benefits Reduced Insurance Premiums for Active Employees and Allowed the Companies to Maintain Their Preferred Coverage with the Most Cost-Effective Carrier.**

By maintaining plans with post-retirement benefits, the Yankees have been able to obtain

less expensive medical insurance premium rates for their active employees.  The reason is

simple:  including retirees within the group plan increases the total number of insureds within the

group which, in turn, lowers rates on a per-insured basis.  The Government's expert, Mr.

Johnson, so agrees.  Thus, keeping the current plans actually reduced the amount of premiums paid for active insureds in Phase IV, thereby mitigating an undisputed portion of the Yankees' claimed damages.

The evidence will also show that it was not possible to drop medical coverage for the Yankees' retirees and still maintain a fully-insured plan[10] with Cigna, the carrier that offered the Yankees the lowest rates.  Maintaining retiree coverage thus allowed the Yankees to continue their preferred type of insurance plan at the most competitive price.

The advantages of including retirees within the Yankees' group insurance plan were not outweighed by the potential for increased administrative costs over those that would be paid for active employees alone.  Indeed, Mr. Parson will testify that the types of administrative costs that the Government disputes would not have been significantly reduced if benefits for the Yankees' current retirees had been eliminated.

### B.      The Costs the Yankees Incurred to Administer Their Health and Welfare Benefits Plans Were Reasonable.

Not only was it reasonable for the Yankees to continue their current health and welfare benefits plans, but the costs to administer those plans were also reasonable.  During Phase IV, the Yankees incurred approximately $3.2 million to administer their health and welfare plans. Of those amounts, the Yankees included $1,133,160 in their damages claims, approximately 35%.[11]

---

[10] A "fully-insured" plan is the typical arrangement where a carrier receives premiums from employee participants and/or the employer, and the carrier assumes the risk for participants' claims.

[11] Generally, the Yankees did not claim administrative costs that were paid from the Yankees' VEBA trust assets.  To the extent the Government suggests that the Yankees should have paid more administrative expenses from their VEBA trusts, the Yankees will demonstrate that they properly exercised their discretion in paying costs from the trusts based on such criteria as (1) whether the costs may be properly paid from VEBA trust assets under the Internal Revenue Code and ERISA, and (2) whether paying additional administrative costs from the trust would deplete the trust's assets to pay post-retirement benefits, thereby requiring additional collections from ratepayers to fund future benefits.  Of

The Government purports to challenge only the portion of the benefits administration costs included within the Yankees' claims that relate to the provision of post-retirement benefits. As an initial matter, Mr. Couchman's calculation of such costs is overbroad, and many of the costs he includes relate to the provision of current benefits for active employees. But whether characterized as "post-retirement" related or not, all of the costs the Government disputes were reasonably incurred. Testimony at trial will confirm the business need for each disputed cost and explain the Yankees' continuing efforts to manage and reduce such administrative costs, thereby mitigating the damages claimed against the Government.

The Yankees nevertheless expect that the Government will challenge the reasonableness of the disputed administrative costs through the testimony of Mr. Johnson. Mr. Johnson's opinions are based on his comparison of the administrative expenses reported for the Yankees' plans in their annual "Form 5500"[12] filings to the administrative expenses reported by plans that filed Form 5500s in the same years. He concludes that the Yankees' reported expenses were higher than the average. Mr. Johnson, however, concedes that the Form 5500s only report costs paid from plan assets (*e.g.*, a plan-dedicated trust), and do not include expenses paid from corporate assets. Because different employers choose to pay administrative expenses from different sources, only some of which are reported in Form 5500s, such filings do not serve as a reliable benchmark for assessing average administrative costs. This is but one example of many that render Mr. Johnson's opinions concerning the Yankees' administration of their benefits plans speculative and flawed.

---

course, even costs paid from VEBA trust assets may be recoverable as damages. Whether a cost is recoverable does not depend on its funding source, but whether it was reasonably incurred as a result of the Government's continuing breach.

[12] The Form 5500 is an annual filing made to the Department of Labor by employers who maintain a pension or welfare benefit plan covered by ERISA.

### C.     The Challenged Benefits Administration Costs Were Caused by the Government's Breach.

The Yankees expect the Government to argue that the benefits administration costs it challenges were not caused by the Government's continuing breach.  Essentially, the Government apparently believes that because the Yankees would have terminated their health and welfare benefits programs—including post-retirement benefits—in the non-breach world, the companies should have pursued a strategy to terminate post-retirement benefits in the breach world, and that any decision to continue to offer such benefits must have been based on interests other than their mitigation efforts to maintain and store SNF in their possession.

First, it is nonsensical to suggest that the same business strategy applicable to a company going out of business would also apply to the same company in circumstances when it must continue operations indefinitely.  The Yankees will establish that it would be very unusual for an operating company to terminate in its entirety an existing post-retirement benefits program with prefunded assets, and that doing so would have disadvantaged the Yankees and their employees in several ways.[13]

Second, the Government's argument improperly conflates "causation" with "reasonableness."  The Court has already ruled that but for the Government's delay, the Yankees would have been out of business, and the health and welfare benefits plans terminated, before Phase IV.  It was the Government's continuing breach, therefore, that led to the Yankees' continued business operations, including the continued administration of their benefits plans.  Thus, the relevant question is not causation, but simply whether the claimed costs were reasonably incurred.

---

[13] In contrast, in the circumstance of the Yankees going out of business in the non-breach world, the companies would have had to disposition their VEBA assets in some fashion, and the cash out option was the most viable and reasonable option as of the relevant dates.

Finally, the Government's "causation" argument gives no weight to the employee retention aspect of the Yankees' continued administration of health and welfare plans with post-retirement benefits.  In fact, six of the Yankees' 22 currently active employees became eligible for post-retirement benefits after January 2013 – the start of Phase IV, including the companies' CFO, Ms. Pizzella, and Wayne Norton, Connecticut Yankee and Yankee Atomic's CEO, and Maine Yankee's Chief Nuclear Officer.  Any decision to terminate the post-retirement benefits prior to Phase IV would have increased the risk that the Yankees' employees would leave the company for a competitor offering such benefits.

For the reasons set forth above, and others to be discussed at trial, the Yankees are entitled to recover the entirety of the $909,913 in benefits administration costs that the Government disputes.

### Issue 2:  The Yankees' General Counsel's Compensation Is Recoverable.

This category of disputed costs concerns a portion of the retainer that the Yankees paid to Joseph Fay, Esq., their part-time general counsel, for legal services in Phase IV.  Mr. Fay has been general counsel for Maine Yankee since 2000 and for Connecticut Yankee and Yankee Atomic since 2006.  During Phase IV, his compensation was fixed at between $160,000 to $165,000 per year for up to 700 hours of work, split evenly among the three companies (approximately $55,000 per year for each company).  The Yankees claim Mr. Fay's full annual compensation as damages.

The Government argues that Mr. Fay's records show that he spent approximately 14% of his time on DOE litigation, so the claim should be reduced by $92,555.

Mr. Fay's scope of services include management and oversight of all of the companies' legal issues.  The specific legal issues for which Mr. Fay bills the Yankees vary from year to

year.  Most importantly, Mr. Fay would have been paid the same compensation regardless of the specific activities he worked on during a particular Phase IV year, so long as he did not exceed 700 hours (which was always the case).  By way of example, Mr. Fay was paid the same fixed compensation in a year in which he spent 28 hours managing SNF litigation issues (2013) as he did in a year in which he worked 145 hours on such issues (2014).  Had the Government performed under the Standard Contract, the Yankees would have been out of business and would not have needed a general counsel for any reason during Phase IV.   Thus, all of the retainer paid annually to Mr. Fay is recoverable as damages.

> **Issue 3:  Yankee Atomic's Costs to Research a Potential Sale of a Portion of the Yankee Atomic Site Are Recoverable.**

In Phase IV, Yankee Atomic incurred consulting costs associated with the potential sale of a portion of its site for a wind energy project.  The Government claims these costs were not caused by the Government's breach.  Had the Government performed, however, Yankee Atomic would have dispositioned its land prior to going out of business in 2010,[14] and thus would not have incurred any property consulting costs in Phase IV.  Moreover, Yankee Atomic reduced its Phase III damages claim in the amount of property disposition consulting costs that it would have incurred in the sale of its land in the non-breach world.  Because Yankee Atomic already accounted for the costs it would have incurred to disposition its land in the non-breach world in the prior litigation phase, the additional property disposition consulting costs the company incurred in Phase IV are incremental to the Government's breach and recoverable.

---

[14] *Yankee Atomic Elec. Co.*, 125 Fed. Cl. at 646-47 (identifying disposition of property as one of the activities that would have been required prior to the Yankees going out of business in the non-breach world).

**Issue 4:  Maine Yankee's Decision to Defend and Settle the Wrongful Termination Claim Brought by Its Former Security Officer Was Reasonable, and the Attendant Costs Are Recoverable.**

During Phase IV, a former security contractor employed by G4S Secure Solutions USA, Inc. ("G4S") who worked full-time at the Maine Yankee site filed a wrongful termination claim against G4S and Maine Yankee with the Maine Human Rights Commission.  Maine Yankee, a named defendant in the action, incurred certain costs to defend the action, and then entered into a settlement agreement with the terminated employee and G4S in order to avoid further legal costs and proceedings with respect to defending the claim.  As part of the settlement, Maine Yankee paid one half of the settlement amount.

The Government calculates the amount in question to be $40,980.  Maine Yankee incurred these costs in the normal course of its business, and but for Government's breach, Maine Yankee would have been out of business in 2008 and would not have been subject to this claim.

**Issue 5:  The Yankees' Costs to Defend Asbestos Litigation Are Recoverable.**

During Phase IV, the Yankees also incurred costs relating to two asbestos litigation matters:  (1) the Langevin matter, and (2) the Mazeika matter.  The Government calculates these costs to be $23,620.

Yankee Atomic was sued by plaintiff Langevin in November 2015.   Langevin claimed that the alleged exposure to asbestos at the Yankee Atomic site occurred while he was employed as a truck driver in 1962 and 1963.  His alleged injuries—mesothelioma and other asbestos-related cancer—were discovered in 2015.  Langevin named several defendants other than Yankee Atomic in his complaint.

Maine Yankee, Connecticut Yankee, and Yankee Atomic were each sued by plaintiff Mazeika in August 2016.  Mazeika claimed that he was exposed to asbestos at the Yankee sites between 1979 and 1987 while he was working as a welder for third-party contractors.  His injury was discovered in 2014.  Again, he named several defendants other than the Yankees in his complaint.

Had the Government performed under the Standard Contract, the Yankee utilities would have been out of business for at least three years when each of the plaintiffs first discovered his injuries.  Any claims against the Yankee utilities would have been time-barred under applicable state statutes, which provide protections to dissolving corporations against claims unknown to the corporation at the time of dissolution.  *See, e.g.*, Conn. Gen. Stat. Ann § 33-887; 13 Me. Stat. § 1408; Mass. Gen. Laws ch. 156D, § 14.07.

> **Issue 6:  Yankee Atomic's Costs for the Wayne Plumb Memorial Are Recoverable.**

Finally, the Government challenges $6,912 paid for a small stone monument to commemorate Wayne Plumb, a security manager who served at Yankee Atomic for over 38 years before he died from cancer.  For decades, Mr. Plumb was responsible for the training of security guards at Yankee Atomic and for the safety conditions at the Yankee Atomic plant.  The monument is located at the security guard shooting range on the Yankee Atomic site.  Yankee Atomic reasonably incurred these costs during the normal course of business to commemorate Mr. Plumb, a longtime and valuable resource, and as such, the costs are recoverable.

## VIII.   CONCLUSION

For the reasons stated above and to be presented at trial, the Yankees respectfully ask that the Court enter judgment in their favor in the amount of $104,360,215.

DATED:  November 13, 2018

Respectfully submitted,

/s Robert H. Stier, Jr.
ROBERT H. STIER, JR.
PIERCE ATWOOD LLP
254 Commercial Street
Portland, ME  04101
rstier@pierceatwood.com
Telephone:  (207) 791-1100
Facsimile:  (207) 791-1350

Of Counsel:

LUCUS A. RITCHIE
lritchie@pierceatwood.com
PIERCE ATWOOD LLP

MICHAEL J. DERDERIAN
mderderian@pierceatwood.com
PIERCE ATWOOD LLP

*Attorneys for Plaintiff*

CERTIFICATE OF FILING

I certify that on this 13th day of November, 2018, a copy of the foregoing PLAINTIFFS'
PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW was filed
electronically.  I understand that notice of this filing will be sent to all parties by operation of the
Court's electronic filing system.  Parties may access this filing through the Court's system.

/s Robert H. Stier, Jr.