IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-673C |
| THE UNITED STATES | ) ) ) | |
| Defendant. | ) ) | |
| MAINE YANKEE ATOMIC POWER COMPANY | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-674C |
| THE UNITED STATES | ) ) ) | |
| Defendant. | ) ) | |
| YANKEE ATOMIC ELECTRIC COMPANY | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 17-675C |
| THE UNITED STATES | ) ) ) | |
| Defendant. | ) ) | |

**<u>JOINT STIPULATIONS</u>**

Pursuant to the Court's August 24, 2018 Order and Appendix A, ¶ 17 of the Rules of the United States Court of Federal Claims, Plaintiffs Connecticut Yankee Atomic Power Company ("Connecticut Yankee"), Maine Yankee Atomic Power Company ("Maine Yankee"), and Yankee Atomic Electric Company ("Yankee Atomic") (collectively, "Yankees" or "Plaintiffs"), and Defendant United States ("the Government") respectfully submit the following joint stipulations for trial.

1. Each Plaintiff formerly operated a nuclear power plant that has been shut-down and decommissioned for over a decade.

2. Connecticut Yankee's sole nuclear power plant was located in Haddam Neck, Connecticut.  Connecticut Yankee stopped producing power in 1996, and completed decommissioning of its power plant in 2007.  Connecticut Yankee's Independent Spent Fuel Storage Installation ("ISFSI"), the spent nuclear fuel and high-level nuclear waste (collectively, "SNF") it stores, and certain buildings related to SNF storage are all that presently remain at the Haddam Neck site.

3. Maine Yankee's sole nuclear power plant was located in Wiscasset, Maine. Maine Yankee stopped producing power in 1996, and completed decommissioning of its power plant in 2005.   Maine Yankee's ISFSI, the SNF it stores, and certain buildings related to SNF storage are all that presently remain at the Wiscasset site.

4. Yankee Atomic's sole nuclear power plant was located in Rowe, Massachusetts. Yankee Atomic stopped producing power in 1992, and completed decommissioning of its power plant in 2007.  Yankee Atomic's ISFSI, the SNF it stores, and certain buildings related to SNF storage are all that presently remain at the Rowe site.

5. Under the Nuclear Waste Policy Act of 1982 ("NWPA"), the United States, acting through the Department of Energy ("DOE"), in 1983 entered into a contract with each Yankee utility pursuant to which DOE, in return for payment of substantial fees by each Yankee utility, is obligated to accept and permanently dispose of spent nuclear fuel and high-level nuclear waste (collectively, "SNF") generated by the commercial nuclear power plant owned and operated by each Yankee utility (the "Standard Contract").

6. Under the Standard Contract, the Government was to commence acceptance of SNF by January 31, 1998.

7. The Government did not commence acceptance of SNF by January 31, 1998. To date, DOE has not yet accepted SNF under the Standard Contract.

8. In Phase I of this litigation, the Court established that the Government was liable for partial breach of the Standard Contract. *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223 (1998), *aff'd by*, *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000).

9. This is the fourth round of lawsuits the Yankees have filed against the United States seeking damages for DOE's continuing breach of its obligation to accept each Yankee utility's SNF. In this round of litigation, each Yankee utility seeks to recover costs incurred for the period January 1, 2013 through December 31, 2016 ("Phase IV").

10. The Court determined in the last phase of litigation—Phase III— that, had the Government performed under the Standard Contract, Maine Yankee would have been out of business by the end of 2008, while Connecticut Yankee and Yankee Atomic each would have been out of business by the end of 2010. *Yankee Atomic Elec. Co. v. United States*, 125 Fed. Cl. 641, 644 (2016).

11. During this claim period, each Yankee utility has maintained its corporate existence only due to the SNF stored at its site.

12. In this phase of litigation, the Yankees initially claimed a total of $104,991,994 in damages. The Yankees revised their claims throughout the audit and discovery process. The Yankees presently claim a total of $104,360,215 in damages, broken down by company as follows:

|  | CY | MY | YA | Total |
|---|---|---|---|---|
| Initial Claim | $ 41,254,078 | $ 34,976,848 | $ 28,761,068 | $ 104,991,994 |
| Agreed-to Adjustments | $ (171,442) | $ (195,928) | $ (264,409) | $ (631,779) |
| Current Claim | $ 41,082,636 | $ 34,780,920 | $ 28,496,659 | $ 104,360,215 |

13. Of these total claimed costs, the Government does not dispute that the Yankees incurred costs in the amount of $103,272,459. As to these undisputed costs, the Government concedes that such costs represent costs incurred to reasonably operate and maintain the Yankees' SNF storage facilities as a result of DOE's partial breach of the Standard Contract. The undisputed costs are broken down by company as follows:

|  | CY | MY | YA | Total |
|---|---|---|---|---|
| Undisputed Costs | $40,740,462 | $34,432,687 | $28,099,310 | $103,272,459 |

14. The remaining, disputed costs amount to $1,087,757. Although the Government does not concede that it is liable for any of the disputed costs included in the Yankees' damages claims, the parties agree that during Phase IV the Yankees actually incurred these costs, which are supported by adequate contemporaneous documentation for the particular activity to which they have been assigned in the Yankees' accounting systems. These disputed costs are broken down by category and amount as follows:

3

|  | CY | MY | YA | Total |
|---|---:|---:|---:|---:|
| **Benefits Administration Costs** | $ 307,078 | $ 271,194 | $ 331,641 | $ 909,913 |
| **General Counsel Services** | $ 30,852 | $ 30,852 | $ 30,852 | $ 92,555 |
| **Legal Fees - Wrongful Termination** | $ - | $ 40,980 | $ - | $ 40,980 |
| **Legal Fees - Asbestos** | $ 4,245 | $ 5,208 | $ 14,167 | $ 23,620 |
| **Property Disposition** | $ - | $ - | $ 13,778 | $ 13,778 |
| **Walter Plumb Monument** | $ - | $ - | $ 6,912 | $ 6,912 |
|  | $ 342,174 | $ 348,233 | $ 397,349 | $ 1,087,757 |

*Health and Welfare Benefits Administration Costs (all Yankees)*

15.     At all relevant times, the Yankees have provided welfare benefits to employees actively at work ("active employees") as well as eligible former employees ("retirees"). Each Yankee utility has a separate welfare benefits plan that determines who is eligible and how benefits are paid.

16.     As part of their welfare benefits plans, the Yankees offer post-retirement benefits to certain eligible active employees and retirees. These post-retirement benefits include medical, prescription drug, dental and life insurance. For eligible current retirees, the plans provide insurance coverage that varies by company and retiree based on such criteria as age, years of service, and date of retirement. With respect to some active employees, the plans promise to provide insurance coverage in the future, after the employee retires, if the employee meets certain eligibility criteria.

17.     Each Yankee utility funds its post-retirement welfare benefits in an external trust which qualifies as a voluntary employees' beneficiary association ("VEBA trust") under the Internal Revenue Code.

18.     To maintain and administer their welfare benefits plans, the Yankees use third-party vendors who provide legal, human resources, audit, actuarial, and accounting services.

19. The Yankees claim as damages certain costs incurred during Phase IV associated with administering their welfare benefits plans. Although the parties do not agree on whether these costs are recoverable, they stipulate that the Yankees actually incurred the $909,913 in disputed costs related to welfare benefits administration.

These disputed benefits administration costs are broken down by company and vendor as follows:

|  | CY | MY | YA | Total |
|---|---|---|---|---|
| Verrill Dana | $ 77,538 | $ 8,125 | $ 100,749 | $ 186,412 |
| CBAS (Karen Cox) | $ 117,189 | $ 116,710 | $ 117,397 | $ 351,295 |
| Savitz | $ 69,785 | $ 102,605 | $ 69,422 | $ 241,812 |
| Berry Dunn | $ 42,565 | $ 42,565 | $ 42,565 | $ 127,695 |
| Marcum | $ - | $ 1,190 | $ 1,509 | $ 2,699 |
|  | $ 307,078 | $ 271,194 | $ 331,641 | $ 909,913 |

a. <u>Verrill Dana</u>: In Phase IV, the Yankees paid $186,412 in disputed costs to Verrill Dana LLP, the Yankees' legal counsel for benefits-related issues. The disputed costs paid to Verrill Dana are broken down by company and year as follows:

|  | CY | MY | YA | Total |
|---|---|---|---|---|
| 2013 | $ 17,357 | $ - | $ 23,156 | $ 40,513 |
| 2014 | $ 16,875 | $ 6,363 | $ 30,532 | $ 53,770 |
| 2015 | $ 16,577 | $ 929 | $ 21,800 | $ 39,306 |
| 2016 | $ 26,731 | $ 833 | $ 25,261 | $ 52,825 |
|  |  |  |  | $ 186,412 |

b. <u>CBAS (Karen Cox)</u>: In Phase IV, the Yankees paid $351,295[1] in disputed costs to Karen Cox, the benefits manager for all three Yankee companies. The disputed costs paid to Karen Cox are broken down by company and year as follows:

|      | CY        | MY        | YA        | Total      |           |
|------|-----------|-----------|-----------|------------|-----------|
| 2013 | $ 37,148  | $ 29,118  | $ 29,118  | $ 95,384   |           |
| 2014 | $ 22,651  | $ 30,201  | $ 30,680  | $ 83,533   |           |
| 2015 | $ 31,060  | $ 31,060  | $ 31,268  | $ 93,389   |           |
| 2016 | $ 31,730  | $ 31,730  | $ 31,730  | $ 95,189   |           |
|      |           |           |           | $ 367,494  |           |
|      |           |           |           | $ (16,199) | *Govt. offset* |
|      |           |           |           | $ 351,295  |           |

c. <u>Savitz</u>: In Phase IV, the Yankees paid $241,812 in disputed actuarial services costs to The Savitz Organization. The disputed costs paid to Savitz are broken down by company and year as follows:

|      | CY        | MY        | YA        | Total      |
|------|-----------|-----------|-----------|------------|
| 2013 | $ 16,275  | $ 21,725  | $ 15,787  | $ 53,787   |
| 2014 | $ 15,500  | $ 27,800  | $ 16,325  | $ 59,625   |
| 2015 | $  7,200  | $ 10,075  | $  7,025  | $ 24,300   |
| 2016 | $ 30,810  | $ 43,005  | $ 30,285  | $ 104,100  |
|      |           |           |           | $ 241,812  |

---

[1] The disputed costs consist of the costs of Ms. Cox's services less a $16,199 offset asserted by the Government in favor of the Yankees.

d. <u>Berry Dunn</u>: In Phase IV, the Yankees paid $127,695 in disputed welfare plan audit costs to Berry Dunn LLP.  The disputed costs paid to Berry Dunn during are broken down by company and year as follows:

|      | CY        | MY        | YA        | Total      |
|------|-----------|-----------|-----------|------------|
| 2013 | $ 11,200  | $ 11,200  | $ 11,200  | $ 33,600   |
| 2014 | $ 10,500  | $ 10,500  | $ 10,500  | $ 31,500   |
| 2015 | $ 10,250  | $ 10,250  | $ 10,250  | $ 30,750   |
| 2016 | $ 10,615  | $ 10,615  | $ 10,615  | $ 31,845   |
|      |           |           |           | $ 127,695  |

e. <u>Marcum</u>: In Phase IV, the Yankees paid $2,699 in disputed accounting services costs to Marcum LLP.  The disputed costs paid to Marcum during Phase IV are broken down by company and year as follows:

|      | CY    | MY      | YA      | Total   |
|------|-------|---------|---------|---------|
| 2013 | $ -   | $ -     | $ -     | $ -     |
| 2014 | $ -   | $ -     | $ -     | $ -     |
| 2015 | $ -   | $ -     | $ -     | $ -     |
| 2016 | $ -   | $ 1,190 | $ 1,509 | $ 2,699 |
|      |       |         |         | $ 2,699 |

### *Costs for General Counsel Services (all Yankees)*

20.   The Yankees claim as damages the annual retainer paid to Yankees' General Counsel Joseph Fay, Esq. during Phase IV.  The Government contests $92,555 of such costs on the grounds that they relate to time Mr. Fay spent on the Yankees' SNF litigation matters.  Without agreeing upon the recoverability of these costs, the parties stipulate that the Yankees actually incurred the $92,555 in disputed costs related to Mr. Fay's compensation.  These disputed costs are broken down by company as follows:

| CY       | MY       | YA       | Total    |
|----------|----------|----------|----------|
| $30,852  | $30,852  | $30,852  | $92,555  |

7

### *Property Disposition Costs (Yankee Atomic only)*

21.     Yankee Atomic claims as damages costs incurred to evaluate the potential sale of a portion of its site for a wind energy project.  Without agreeing upon the recoverability of these costs, the parties stipulate that Yankee Atomic actually incurred the $13,778 in disputed costs related to property disposition consulting services.

### *Costs Associated with Wrongful Termination Suit (Maine Yankee only)*

22.     Maine Yankee claims as damages costs incurred to defend and settle a wrongful termination claim asserted by a former Maine Yankee security force member.  Without agreeing upon the recoverability of these costs, the parties stipulate that Maine Yankee actually incurred the $40,980 in disputed costs related to such claim.  These disputed costs are broken down as follows: $27,480 in legal fees, and $13,500 in settlement payment.

### *Costs Related to Asbestos Litigation (all Yankees)*

23.     The Yankees claim as damages costs related to two asbestos litigation matters.  Without agreeing upon the recoverability of these costs, the parties stipulate that the Yankees actually incurred the $23,620 in disputed costs related to such matters.  These disputed costs are broken down by company as follows:

| CY | MY | YA | Total |
|---|---|---|---|
| $4,245 | $5,208 | $14,167 | $23,620 |

### *Costs for Wayne Plumb Memorial (Yankee Atomic)*

24.     Yankee Atomic claims as damages costs incurred for a stone monument to commemorate a former security officer.  Without agreeing upon the recoverability of these costs, the parties stipulate that Yankee Atomic actually incurred the $6,912 in disputed costs related to the stone monument.

*Termination of Welfare Benefits Plans in the Non-Breach World*

25. Had the Government performed under the Standard Contract, the Yankees would have terminated their welfare benefits plans and disposed of their VEBA trust assets prior to going out of business. Assuming Government performance as determined in the prior litigation phases, the parties stipulate as follows:

 a. Maine Yankee, as part of its efforts to wind down the company, would have terminated its welfare benefits plan in 2006.

 b. Connecticut Yankee and Yankee Atomic, as part of their wind-down efforts, would have each terminated its welfare benefits plan in 2008.

 c. As part of its going-out-of-business strategy, each Yankee utility would have disposed of the plan assets held in each company's respective VEBA trust by "cashing out" the trust and disbursing available assets to eligible plan participants as cash. Eligible plan participants receiving cash distributions would have been those participants who qualified for post-retirement welfare benefits as of the termination date for each respective welfare benefits plan.

26. The parties agree that they are entering into the stipulations to paragraphs 1 through 26 to obviate the need to introduce evidence at trial with respect thereto. The parties further agree that they have conducted their own due diligence as to each stipulation.

Respectfully submitted,

| | |
|---|---|
| /s/ Robert H. Stier, Jr.<br>ROBERT H. STIER, JR.<br>PIERCE ATWOOD LLP<br>254 Commercial Street<br>Portland, ME  04101<br>rstier@pierceatwood.com<br>Telephone:  (207) 791-1100<br>Facsimile:  (207) 791-1350 | JOSEPH A. HUNT<br>Assistant Attorney General<br><br>ROBERT E. KIRSCHMAN, JR.<br>Director |
| Of  Counsel:<br><br>LUCUS A. RITCHIE<br>lritchie@pierceatwood.com<br>PIERCE ATWOOD LLP<br><br>MICHAEL J. DERDERIAN<br>mderderian@pierceatwood.com<br>PIERCE ATWOOD LLP<br><br>*Attorneys for Plaintiffs*<br><br><br>DATED:  December 18, 2018 | /s Lisa L. Donahue<br>LISA L. DONAHUE<br>Assistant Director<br><br>/s Margaret J. Jantzen<br>MARGARET J. JANTZEN<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480, Ben Franklin Station<br>Washington, DC 20044<br>Tel: (202) 353-7994<br>Margaret.j.jantzen@usdoj.gov<br><br>*Attorneys for Defendant* |

CERTIFICATE OF FILING

    I certify that on this 18th day of December, 2018, a copy of the foregoing JOINT STIPULATIONS was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Robert H. Stier, Jr.